UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PRICE DUNBAR,
*Plaintiff*,

v.                                                     No. 3:22-cv-627 (JAM)

DEPARTMENT OF CORRECTION *et al.*,
*Defendants*.

**INITIAL REVIEW ORDER PURSUANT TO 28 U.S.C. § 1915A**

Plaintiff Price Dunbar is a prisoner in the custody of the Connecticut Department of

Correction ("DOC") at the Garner Correctional Institution.[1] He has filed this *pro se* and *in forma*

*pauperis* action under 42 U.S.C. § 1983 principally alleging that the defendants acted with

deliberate indifference to his serious medical needs, used excessive force, and retaliated against

him.[2]

Dunbar identifies in the introduction of his complaint the following entities or persons as

party defendants: the DOC, Deputy Warden Carlos Nunez, Deputy Warden Michael Pierce;

Deborah Broadley; Pitts; and Nurses Jane, Alexis, and Hector.[3] He also names as defendants six

---

[1] Doc. #1 at 2 (¶ 1). Dunbar was sentenced to prison on August 30, 2018. *See* Connecticut Judicial Branch Criminal/Motor Vehicle Conviction Case Detail, *State v. Price Dunbar*, Dkt No. U04W-CR16-0435889-S, https://www.jud2.ct.gov/crdockets/CaseDetailDisp.aspx?source=Pending&Key=e0397cac-5bba-4617-aaf4-db6d78da72b2 [https://perma.cc/3288-H4ZM] (last accessed Jan. 9, 2023).

[2] Doc. #1 at 2–11. Dunbar alleges state law claims of assault and battery as well as negligence. *Id.* at 2. The court limits its review for purposes of 28 U.S.C. § 1915A to federal law claims. That is because the core purpose of an initial review order is to make a speedy initial-screening determination of whether the lawsuit may proceed at all in federal court and should be served upon any of the named defendants. If there are no facially plausible federal law claims against any of the named defendants, then the court would decline to exercise supplemental jurisdiction over any state law claims under 28 U.S.C. § 1367. On the other hand, if there are any viable federal law claims that remain, then the validity of any accompanying state law claims may be appropriately addressed in the usual course by way of a motion to dismiss or motion for summary judgment. More generally, the Court's determination for purposes of an initial review order under 28 U.S.C. § 1915A that any claim may proceed against a defendant is without prejudice to the right of any defendant to seek dismissal of any claims by way of a motion to dismiss or motion for summary judgment.

[3] Doc. #1 at 3 (¶ 3). The complaint does not identify the first names of certain defendants, but the Court takes judicial notice that Michael Pierce and Carlos Nunez are listed as Deputy Wardens at Cheshire Correctional Institution. *See* Office of the Secretary of the State, Department of Correction – Department of Emergency Services and Public Protection, https://portal.ct.gov/SOTS/Register-Manual/Section-IV/Dept-of-Correction---Dept-of-Emergency-Svs-and-Public-Protection [https://perma.cc/J9B2-NQ28] (last accessed Jan. 9, 2023).

John Does who "are currently unknown officer[s]" in their individual and official capacities.[4] In addition, the body of the complaint identifies another nurse "Stacy" as a putative defendant as well as another DOC official named "Walker" who was the warden at Cheshire Correctional Institution.[5]

Dunbar seeks damages, a declaratory judgment, and injunctive relief.[6] After an initial review of the complaint pursuant to 28 U.S.C. § 1915A, I conclude that some claims may proceed against some of the named defendants but that the remaining claims and defendants should be dismissed for the reasons set forth below.

## BACKGROUND

The facts below are drawn from the complaint and assumed to be true only for the purposes of this ruling.

In April 2021, Dunbar began to experience "preliminary seizure indicators" while in his cell.[7] He yelled for help.[8] A guard (*i.e.*, defendant John Doe 1) arrived and after Dunbar explained his symptoms the guard told him that he would not call for medical assistance and told him to lay down on his bunk.[9] The guard walked away.[10]

Dunbar continued to call for help to no avail.[11] After returning to his bunk and laying down, he "suffered a violent near fatal grand mal seizure, fell off his bunk[, and] was instantly injured."[12] He later woke up on the floor of the cell and felt an "astronomical amount of pain."[13]

---

[4] Doc. #1 at 3 (¶ 4).
[5] *Id.* at 6 (¶ 11) (Stacy), 8 (¶ 19) (Walker).
[6] *Id.* at 11 (¶¶ A–E).
[7] *Id.* at 4 (¶ 6).
[8] *Ibid.* (¶ 7).
[9] *Ibid.*
[10] *Ibid.*
[11] *Id.* at 5 (¶ 8).
[12] *Ibid.*
[13] *Ibid.* (¶ 9).

After he stood up, he notified the guards about his condition.[14] Rather than issue a "code white"—an alert for medical assistance—John Doe 1 had Dunbar walk to the medical unit, telling him that he hopes he falls down on the way there.[15]

When Dunbar arrived at the medical unit, he told two nurses (*i.e.*, "defendants Stacy [and] Alexis") that he had just suffered a seizure, fell off his bunk, and was experiencing lightheadedness and pain.[16] The nurses replied that they could only "take [his] vitals."[17]

Dunbar then asked another nurse (*i.e.*, defendant Jane) for help.[18] He told her that he had a bottom-bunk pass but was housed in a cell with another inmate who also had a bottom-bunk pass.[19] In response, Stacy began to verbally abuse Dunbar, yelling that she would only take his "vitals," and then—to cover her apparent misconduct—she falsely documented that Dunbar had refused medical care.[20]

Defendant Pitts and five unidentified guards (*i.e.*, John Does 2–6) arrived soon thereafter and "forcefully stripped" Dunbar against his will, exacerbating his back, side, and head injuries.[21] Pitts, Jane, and the five guards then escorted Dunbar to the Restrictive Housing Unit as punishment for requesting medical care.[22] When Dunbar complained about his injuries, "[d]efendants mouthed the words 'shut up' [and] closed the slot on his [cell] door in his face."[23]

---

[14] *Ibid.*
[15] *Ibid.*
[16] *Id.* at 6 (¶ 11).
[17] *Ibid.*
[18] *Ibid.* (¶ 12).
[19] *Ibid.*
[20] *Ibid.*
[21] *Ibid.* (¶ 13).
[22] *Ibid.* Dunbar also states that he "was taken to [restrictive housing] for being argumentative about [his] lack of treatment." *Id.* at 25.
[23] *Id.* at 6 (¶ 13).

At the Restrictive Housing Unit, Dunbar began to experience lightheadedness, dizziness, and blurry vision.[24] He called out for help, and defendants told him again to "shut up."[25] He remained alone in his cell for seven days, suffering several more seizures.[26] No one helped him.[27] Three out of the seven nights that Dunbar remained in restrictive housing, Jane threatened to kill him, refused to help him, and tried to give him pills that could have led to his death.[28] Dunbar alerted Pierce, Warden Walker, and Nunez about Jane's threats, but they took no action.[29]

In May 2021, Jeffrey Hutcoe, Dunbar's attorney, wrote a letter to Walker on Dunbar's behalf.[30] He explained that Dunbar suffered from a grand-mal seizure prior to his incarceration and that a doctor had advised him to see a neurologist.[31] Walker never responded.[32]

Before Dunbar's seizure and isolation in restrictive housing, he wrote "several grievances" to the DOC explaining that he has a seizure disorder.[33] In March 2021, Dunbar wrote to Hector and told him that he had sustained a seizure and awoke on the floor of his cell.[34] Hector refused to assist him and did not respond to his letter until two days later, despite a "DOC directive [that] mandate[s] a seizing inmate to receive instant medical care."[35] Dunbar also told

---

[24] *Id.* at 7 (¶ 14).

[25] *Ibid.*

[26] *Ibid.*

[27] *Ibid.*

[28] *Ibid.* (¶ 15). Dunbar refers to "Nurse Jane" in this paragraph as "nurse Jane Doe." *Ibid.* It is not clear from Dunbar's complaint if "Jane" is the last name of "Nurse Jane," or if Dunbar does not know the name of this nurse and is referring to her as a Jane Doe.

[29] *Id.* at 9 (¶ 21), 16–19 (Exs. E, F). The Court understands the "Walker" Dunbar names to be former Warden Denise Walker. *See* Connecticut State Department of Correction, Cheshire Correctional Institution, https://portal.ct.gov/DOC/Facility/Cheshire-CI [https://perma.cc/LR5Q-CP7Q] (last accessed Jan. 9, 2023) (listing Walker as the warden from 2020–2021).

[30] *Id.* at 8 (¶ 19), 15 (Ex. D).

[31] *Id.* at 15 (Ex. D).

[32] *Id.* at 8 (¶ 19).

[33] *Id.* at 7 (¶ 16). Dunbar claims that his seizure disorder qualifies him as an individual with a disability under the Americans with Disabilities Act. *Id.* at 4 (¶ 5).

[34] *Id.* at 7 (¶ 16).

[35] *Ibid.*

Hector not to tamper with his medications.[36] But Hector ignored him and responded that Dunbar

needed to "sign up for sick call."[37] Dunbar never received any care.[38]

In January 2022, following Dunbar's seizures in April 2021, he wrote to Nunez and

Pierce and told them of his seizures, disorder, and concerns for his safety.[39] Pierce responded that

Dunbar needed to write his unit manager and never helped him further.[40]

Dunbar alleges that he remains alone in a cell and at significant risk of harm if he has a

seizure.[41] Because the guards patrol in fifteen-minute increments, Dunbar is scared that he will

not receive medical attention soon enough if he has a seizure.[42] Although DOC's employees are

aware of his condition, they have refused to assist him and have never responded to his requests

for medical care.[43]

Dunbar's complaining caused defendants to retaliate against him.[44] They changed his

medications and failed to deliver them to him in a timely manner.[45] He was eventually

transferred from the Cheshire Correctional Institution as a result, but he continues to remain

untreated and alone in a cell.[46]

Dunbar claims defendants showed deliberate indifference to his medical needs and used

excessive force against him.[47] He also claims that defendants failed to supervise DOC employees

---

[36] *Id.* at 8 (¶ 17).
[37] *Ibid.*
[38] *Ibid.*
[39] *Ibid.* (¶ 18).
[40] *Ibid.*
[41] *Id.* at 9 (¶ 20).
[42] *Ibid.*
[43] *Id.* at 9 (¶ 20), 10 (¶ 23), 23–24 (Ex. I).
[44] *Id.* at 9 (¶ 22); *see also id.* at 20–21 (Exs. G, H).
[45] *Id.* at 9 (¶ 22). Dunbar filed a Health Services Review ("HSR") grievance about not receiving his medication. *Id.* at 21 (Ex. H). HSR Coordinator Debra Cruz responded that while Dunbar was in restrictive housing his medication was changed and should have been, but was not, changed back after he was discharged. *Id.* at 22. She stated that the medical staff was "currently working on this process to prevent this problem in the future." *Ibid.*
[46] *Id.* at 10 (¶ 25).
[47] *Ibid.* (¶ 27).

and to protect him from "unconstitutional acts."[48] He alleges violations of his First, Eighth, and Fourteenth Amendment rights as well as violations of 42 U.S.C. § 12101.[49] He seeks declaratory and injunctive relief as well as damages.[50]

**DISCUSSION**

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." A complaint may not survive an initial review pursuant to § 1915A unless it alleges facts that, taken as true, give rise to plausible grounds to sustain a plaintiff's claims for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Vengalattore v. Cornell Univ.*, 36 F.4th 87, 102 (2d Cir. 2022) (discussing applicable principles for review of the adequacy of a complaint).[51]

A court must "accept as true all factual allegations and draw from them all reasonable inferences; but [it is] not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019). If the plaintiff is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010).

---

[48] *Ibid.*

[49] *Id.* at 11 (¶ 27).

[50] *Ibid.* (Relief Requested).

[51] Unless otherwise indicated, this opinion omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions. Nor do case citations include subsequent history not relevant for present purposes.

### *DOC and official capacity claims*

Dunbar sues the DOC and individual DOC employees in their official capacity. The

Eleventh Amendment bars a federal court from holding the DOC or any DOC employees in their

official capacity liable for money damages. *See Kelly v. New York State Unified Ct. Sys.*, 2022

WL 1210665, at *1 (2d Cir. 2022). Accordingly, I will dismiss Dunbar's claims against the DOC

and individual DOC employees in their official capacity. The balance of this ruling will evaluate

whether Dunbar has alleged facts that give rise to plausible grounds for relief against the named

defendants in their personal capacity.

### *Deliberate indifference to safety and serious medical needs*

The Eighth Amendment to the U.S. Constitution prohibits "cruel and unusual

punishments." U.S. Const. amend. VIII. Dunbar generally alleges that the defendants violated the

Eighth Amendment by: (1) consistently ignoring his serious seizure condition and manipulating

his pain medication; (2) failing to protect him or address his safety concerns; (3) using excessive

force; (4) and failing to adequately supervise DOC employees.

The Supreme Court has long recognized that prison officials violate the Eighth

Amendment if they are deliberately indifferent to the serious medical needs of a sentenced

prisoner. *See Darby v. Greenman*, 14 F.4th 124, 128 (2d Cir. 2021) (citing *Estelle v. Gamble*,

429 U.S. 97, 104 (1976)). The prisoner must show that "(1) objectively, the alleged deprivation

of medical care was 'sufficiently serious,' and (2) subjectively, that the defendants acted or failed

to act 'while actually aware of a substantial risk that serious inmate harm will result.'"

*Washington v. Artus*, 708 F. App'x 705, 708 (2d Cir. 2017) (quoting *Salahuddin v. Goord*, 467

F.3d 263, 279–80 (2d Cir. 2006)). It is not enough to allege medical malpractice unless the

malpractice involves culpable recklessness—actions that evince a conscious disregard of a

substantial risk of serious harm. *See Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011); *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).

To be "sufficiently serious," the deprivation of medical care must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hill*, 657 F.3d at 122. This inquiry "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280. Factors to consider include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance*, 143 F.3d at 702.

"[A]n inmate seeking to establish an Eighth Amendment violation for failure to protect or deliberate indifference to safety must prove (1) that [the prisoner] is incarcerated under conditions posing a substantial risk of serious harm, and (2) that the prison official had a sufficiently culpable state of mind, which in prison-conditions cases is one of deliberate indifference to inmate health or safety." *Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); *Collazo v. Pagano*, 656 F.3d 131, 135 (2d Cir. 2011) (*per curiam*).

In both instances, the prisoner must allege facts to suggest that the defendants acted not merely carelessly or negligently, but with a subjectively reckless state of mind akin to criminal recklessness. In other words, Dunbar must allege that they were aware of a substantial risk that he would be seriously harmed if they did not act. *See, e.g.*, *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013); *Hilton v. Wright*, 673 F.3d 120, 127 (2d Cir. 2012) (*per curiam*); *Collazo*, 656 F.3d at 135. But "[o]fficials need only be aware of the risk of harm, not

intend harm. And awareness may be proven from the very fact that the risk was obvious."
*Spavone*, 719 F.3d at 138.

Dunbar's seizure disorder was sufficiently serious to satisfy the objective prong of the
Eighth Amendment. *See Milner v. Laplante*, 2022 WL 4599035, at *4 (D. Conn. 2022).
Therefore, I now turn to evaluating whether the complaint alleges enough facts to show that each
of the defendants acted with a sufficiently culpable state of mind to satisfy the subjective prong
of the Eighth Amendment.

*John Doe 1*. Dunbar alleges that he informed Doe 1 that he was experiencing "chest
pains, head pains, [and] blurred vision" and that Doe 1 failed to notify the medical team.[52] After
Dunbar suffered a "violent near fatal grand mal seizure" and fell from his bunk, Doe 1 then made
him walk to the medical unit rather than calling a medical team to assist Dunbar.[53] These claims
are sufficient for initial pleading purposes to allege that Doe 1 acted recklessly despite knowing
the substantial risk facing Dunbar before and after his seizure. Accordingly, I will allow
Dunbar's deliberate indifference claim to proceed against Doe 1.

*Nurses Stacy and Alexis*. When Dunbar arrived at the infirmary, he told Nurses Stacy and
Alexis that he had just suffered a seizure, had fallen from his bunk and injured himself, was still
light-headed, and in pain.[54] In response, they told him all they could do was "take vitals."[55] Stacy
began to verbally abuse Dunbar and told him they would only take his vitals and would falsely
document the record to cover up her misconduct by claiming he refused treatment.[56] These
allegations are enough to suggest that Stacy and Alexis acted with deliberate indifference.

---

[52] *Id.* at 4 (¶ 7).
[53] *Id.* at 5 (¶¶ 8–9).
[54] *Id.* at 6 (¶ 11).
[55] *Ibid.*
[56] *Ibid.* (¶ 12).

Accordingly, I will allow Dunbar's deliberate indifference claim to proceed against Stacy and

Alexis.

*Nurse Jane*. Dunbar asked for "help" in some unspecified way from Jane and told her he

was housed in a cell where both occupants had bottom-bunk passes.[57] But because the complaint

does not allege how Jane responded to this request or whether Jane had any authority as a nurse

to change cell or bunk assignments, I conclude that this allegation does not allege facts to show

that Jane acted with deliberate indifference to Dunbar's safety and serious medical needs.

On the other hand, Dunbar alleges that Jane escorted him to restrictive housing and

mouthed the words "shut up" when he complained of his injuries and also that she threatened to

kill him, subjected him to verbal abuse, refused him medical attention, and attempted to provide

him with pills that could have killed him.[58] These allegations are collectively enough to plausibly

show that Jane acted with intentional or deliberate indifference to Dunbar's safety and serious

medical needs. Accordingly, I will allow Dunbar's deliberate indifference claim to proceed

against Jane.

*Pitts and John Does 2–6*. Dunbar alleges that Pitts and Does 2–6 forcefully stripped him

against his will and escorted him to restrictive housing and mouthed the words "shut up" when

he complained of his injuries.[59] While there, they ignored Dunbar's calls for help, and he

remained alone in his cell for seven days where he seized on several occasions.[60] These

allegations are enough to plausibly show that Pitts and John Does 2–6 acted with intentional or

deliberate indifference to Dunbar's safety and serious medical needs. Accordingly, I will allow

Dunbar's deliberate indifference claim to proceed against Pitts and John Does 2–6.

---

[57] *Ibid.*
[58] *Id.* at 6–7 (¶¶ 13, 15).
[59] *Ibid.* (¶¶ 13–14).
[60] *Id.* at 7 (¶ 14).

*Hector*. Dunbar alleges that Hector failed to timely respond to his grievance seeking

treatment from a neurologist after he seized in March 2021.[61] Hector responded to Dunbar's

complaint two days later, explaining that Dunbar already had an appointment with a neurologist

and that the doctor can increase his seizure medication if necessary.[62] These allegations are

insufficient because they do not show that Hector acted with deliberate indifference to Dunbar's

safety and serious medical needs.

Dunbar also complains that Hector failed to adjust the dosage of his seizure medications

after he requested him to do so.[63] One day after Dunbar submitted the request, Hector responded

that he needed to "sign up for prompt care to discuss."[64] Dunbar alleges that he never received

any care.[65] But Dunbar does not suggest that Hector was aware that Dunbar would not, or did

not, receive any care when he advised him to sign up for it. Dunbar has alleged at most that

Hector acted negligently rather than with a "sufficiently culpable state of mind." *Farmer*, 511

U.S. at 834; *Warwick v. Doe*, 2020 WL 2768804, at *6 (D. Conn. 2020) ("[S]imple negligence of

prison personnel does not constitute deliberate indifference."). Accordingly, I will dismiss

Dunbar's deliberate indifference claim against Hector.

*Pierce, Nunez, and Walker*. Dunbar alleges that Pierce, Nunez, and Walker acted with

deliberate indifference to his safety and failed to protect him.[66] Dunbar alleges that he wrote to

Nunez and Pierce about his seizure condition and the risk of harm posed by housing him alone.[67]

---

[61] *Id.* at 7 (¶ 16), 13 (Ex. B).
[62] *Id.* at 13 (Ex. B).
[63] *Id.* at 8 (¶ 17), 12 (Ex. A).
[64] *Id.* at 12 (Ex. A).
[65] *Id.* at 8 (¶ 17).
[66] *Id.* at 8–10 (¶¶ 18–25).
[67] *Id.* at 8 (¶ 18), 14 (Ex. C).

He also alleges that his attorney wrote to Warden Walker requesting that a neurologist evaluate

Dunbar.[68]

As to Pierce, an exhibit that Dunbar submitted along with his complaint shows that Pierce

advised Dunbar to speak to his unit manager regarding his cell assignment and that he may be

accommodated consistent with safety and security concerns.[69] Dunbar complains that Pierce

"could have fixed [his] issue instantly."[70] But Pierce did not ignore Dunbar's concerns, and

therefore the complaint does not show that Pierce acted with reckless indifference. Accordingly,

I will dismiss Dunbar's claim for deliberate indifference against Pierce.

As to Nunez, the complaint does not allege how Nunez responded to Dunbar's request.

An inmate has no constitutional right to have his grievances addressed or to receive what he

considers to be a proper response. *See Hinton v. Pearson*, 2021 WL 4521994, at *8 (D. Conn.

2021) (citing *Riddick v. Semple*, 731 F. App'x 11, 13 (2d Cir. 2018)). Accordingly, I will dismiss

Dunbar's claim for deliberate indifference against Nunez.

As to Walker, Dunbar complains that Walker never responded to his attorney's letter.[71]

But the failure of a supervisory prison official to respond to a letter of complaint about a

prisoner's treatment does not establish that the official was personally involved with the

deprivation of the prisoner's treatment. *See Cruz v. Naqvi,* 2022 WL 2440399, at *3 (D. Conn.

2022) (citing cases). Accordingly, I will dismiss Dunbar's deliberate indifference claim against

Walker.

---

[68] *Id.* at 8 (¶ 19), 15 (Ex. D).

[69] *Id.* at 14. Pierce's response is faint and difficult to read but appears to contain a misstatement: Dunbar "may be accom[m]odated as long as housing [him] with someone *would* create another medical or safety [and] security concern." *Ibid.* (emphasis added). A common sense reading of that sentence indicates that Pierce mistakenly omitted the word "not" after the word "would." *See ibid.*

[70] *Id.* at 8 (¶ 18).

[71] *Id.* at 8 (¶ 19), 15 (Ex. D).

*Broadley*. Although Dunbar names Broadley as a defendant, he neglects to allege any facts about what Broadley purportedly did to violate his rights. "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Accordingly, I will dismiss Dunbar's claim for deliberate indifference against Broadley.

More generally, Dunbar claims that certain supervisory defendants failed to train and supervise those lower-level DOC employees who violated his rights. But the Second Circuit has ruled that "there is no special rule for supervisory liability" and that "a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (internal quotations omitted). Accordingly, I will dismiss Dunbar's claims for supervisory liability.

### Excessive force strip search

In addition to the other allegations of deliberate indifference as described above against Does 2–6 and Pitts, Dunbar alleges that rather than helping him obtain medical care they forcefully stripped him against his will, exacerbating his back, side, and head injuries.[72] Then along with Jane they escorted him to restrictive housing and told him to shut up when he complained of his injuries and closed the slot on his door in his face.[73]

A prisoner's claim that he has been subject to a strip search may implicate both the Fourth Amendment right to be free from an unreasonable search and seizure, and the Eighth Amendment right to be free from cruel and unusual punishment. *See Harris v. Miller*, 818 F.3d 49, 56–65 (2d Cir. 2016) (*per curiam*). For purposes of a Fourth Amendment claim, a court

---

[72] *Id.* at 6 (¶ 13).
[73] *Ibid.*

should consider whether the inmate has exhibited an actual, subjective expectation of bodily

privacy and whether prison officials had sufficient justification to intrude on the inmate's privacy

in the manner they did. *Id.* at 57–63 (factors to consider include the scope of the particular

intrusion, the manner in which it was conducted, the justification for initiating it, and the place in

which it was conducted). For purposes of an Eighth Amendment claim, a court should consider if

a strip search was done maliciously and sadistically, or if it was done for invidious reasons of

intimidation, harassment, or embarrassment. *See id.* at 65; *King v. McCarty*, 781 F.3d 889, 897

(7th Cir. 2015) (*per curiam*).

Dunbar alleges that he was subject to a strip search without reason and because he had

requested medical assistance. I will allow Dunbar's claim for the use of excessive force in the

form of a strip search in violation of the Fourth and Eighth Amendments to proceed against

defendants Pitts and Does 2–6.

### First Amendment retaliation

Because Dunbar alleges that he was punished for requesting medical care, I liberally

construe his complaint as raising First Amendment retaliation claims.[74]

"Prison officials may not retaliate against inmates for exercising their constitutional

rights." *Perez v. Cook*, 2020 WL 3893024, at *5 (D. Conn. 2020). "To establish a First

Amendment retaliation claim, [Dunbar] must show (1) that the speech or conduct at issue was

protected, (2) that the [official] took adverse action against [him], and (3) that there was a causal

connection between the protected speech and the adverse action." *Kotler v. Boley*, 2022 WL

4589678, at *1 (2d Cir. 2022); *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019). The adverse

action must have been serious enough to "deter a similarly situated individual of ordinary

---

[74] *See id.* at 6 (¶ 13), 9 (¶ 22), 10 (¶ 25).

firmness from exercising [his] constitutional rights." *Fabricio v. Annucci*, 790 F. App'x 308, 311 (2d Cir. 2019).

The Second Circuit has "instructed district courts to approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015). For this reason, a prisoner's retaliation claim must "be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Ibid.*

Dunbar alleges that Jane, Does 2–6, and Pitts "punish[ed] him simply for requesting medical care" when they escorted him to restrictive housing and placed him there for seven days.[75] Although district courts in this Circuit are divided on whether an inmate's request for medical attention falls within the ambit of First Amendment protection, I concur with those courts that have found such speech protected. *See Milner v. Lamont*, 2022 WL 2110971, at *8 (D. Conn. 2022) (citing cases). Accordingly, I will allow Dunbar's claim for First Amendment retaliation to proceed against Jane, Does 2–6, and Pitts.

Dunbar also alleges that defendants changed his medications and ceased delivering his medication in a timely manner to retaliate against him and that he was transferred out of Cheshire "due to the extreme acts of retaliation … toward [him]."[76] But because these allegations are non-specific as to the personal involvement of any particular defendant, they are not sufficient to support a claim for First Amendment retaliation.

---

[75] *Id.* at 6 (¶ 13).
[76] *Id.* at 9 (¶ 22), 10 (¶ 25), 21–22.

### *Declaratory and injunctive relief*

Dunbar seeks declaratory and injunctive relief.[77] I must dismiss Dunbar's official-capacity claims for declaratory and injunctive relief against the individual defendants because Dunbar is no longer confined at Cheshire.[78] Therefore, he is no longer subject to an ongoing constitutional violation due to defendants' conduct. *See Washington v. McKoy*, 816 F. App'x 570, 572–73 (2d Cir. 2020) ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."). Dunbar's requests for declaratory judgments that defendants have violated his constitutional rights in the past are also barred by the Eleventh Amendment. *See Exxon Mobil Corp. v. Healey*, 28 F.4th 383, 394–95 (2d Cir. 2022).

In his complaint, Dunbar alleges that "[h]e remains injured, housed alone with a seizure disorder, [and] at constant imminent risk of danger in the event he seizes … with no one to call for help on his behalf."[79] Dunbar has framed this allegation in the present sense. Because he is currently confined at Garner, not Cheshire, arguably he seeks injunctive relief at that facility. But a plaintiff may seek injunctive relief against a state official only to the extent that he alleges an ongoing violation of the constitutional rights for which a federal court may enter an order of prospective relief against that official in his official capacity. *See, e.g.*, *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011) (citing *Ex parte Young*, 209 U.S. 123 (1908)); *Silva v. Farrish*, 47 F.4th 78, 84 (2d Cir. 2022). Dunbar has not named an official at Garner in his complaint, nor has he alleged any facts to show an ongoing violation of his constitutional rights there.

---

[77] *Id.* at 11 (¶¶ A–B).
[78] *See id.* at 10 (¶ 25).
[79] *Id.* at 9 (¶ 20).

Accordingly, I will dismiss Dunbar's claims for declaratory and injunctive relief.

**CONCLUSION**

For the reasons set forth above, the Court enters the following orders:

(1) Dunbar may proceed on his Eighth Amendment claims for deliberate indifference to his safety and serious medical needs against the following defendants: Nurse Stacy, Nurse Alexis, Nurse Jane, Pitts, and John Does 1–6. Dunbar may also proceed on his Fourth and Eighth Amendment strip search claims against Pitts and John Does 2–6. Dunbar may also proceed on his First Amendment retaliation claim against Jane, Pitts, and John Does 2–6. All these claims may proceed for money damages against the defendants in their individual capacity. Dunbar's state-law claims of negligence as well as assault and battery may also proceed against these defendants.

(2) All other claims and defendants are DISMISSED without prejudice to Dunbar's filing of an amended complaint within 30 days if he has good faith grounds to allege additional facts that overcome the grounds stated in this ruling for dismissing his claims against certain defendants.

(3) The Clerk shall verify the current work addresses for named defendants Nurse Stacy, Nurse Alexis, Nurse Jane, and Pitts with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint (Doc. #1) and this order to them at their confirmed addresses within **twenty-one (21) days of this Order**, and report to the Court on the status of the waiver request by not later than the **thirty-fifth (35) day after mailing**. If any defendant fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshals Service on them, and that defendant shall be required to pay the costs of such service in accordance with Fed. R. Civ. P. 4(d).

(4) The Clerk cannot effect service on any of the John Doe defendants without that defendant's full name and current work address. Plaintiff is directed to obtain this information during discovery and to file a notice containing the information with the court. **Once a defendant Doe has been identified, the Court will order that he or she be served with a copy of the complaint. Failure to identify a Doe defendant by the close of discovery will result in the dismissal of all claims against that defendant**.

(5) The Clerk shall send a courtesy copy of this Order to the DOC Office of Legal Affairs and the Office of the Attorney General.

(6) Defendants shall file their response to the complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.

(7) The discovery deadline is **six months (180 days) from the date of this Order**. The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures," which the Clerk must send to plaintiff with a copy of this Order. The order can be found at http://ctd.uscourts.gov/district-connecticut-public-standing-orders. Note that discovery requests should not be filed with the Court. In the event of a dispute over discovery, the parties should make a good faith effort to resolve the dispute amongst themselves; then, the parties should file the appropriate motion to compel on the docket. Based on this order, plaintiff's Motion to Compel (Doc. #8) is **DENIED** as moot.

(8) All motions for summary judgment shall be filed within **seven months (210 days) from the date of this Order**.

(9) Pursuant to Local Rule 7(a), a nonmoving party must respond to a dispositive motion (*i.e.*, a motion to dismiss or a motion for summary judgment) within **twenty-one (21) days** of the

18

date the motion was filed. If no response is filed, or the response is not timely, the Court may

grant the dispositive motion without further proceedings.

(10) If Dunbar changes his address at any time during the litigation of this case, Local

Court Rule 83.1(c)(2) provides that he MUST notify the court. Failure to do so can result in the

dismissal of the case. Dunbar must give notice of a new address even if he is incarcerated. He

should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put

the new address on a letter without indicating that it is a new address. If plaintiff has more than

one pending case, he must indicate all of the case numbers in the notification of change of

address. Plaintiff must also notify the defendants or defense counsel of his new address.

(11) Plaintiff shall utilize the Prisoner E-Filing Program when filing documents with the

Court. He is advised that the Program may be used only to file documents with the Court. As

discovery requests are not filed with the Court, the parties must serve discovery requests on each

other by regular mail.

It is so ordered. Dated at New Haven this 10th day of January 2023.


/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge